NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Site Evaluation Committee
No. 2017-0313

APPEAL OF MARY ALLEN & a.
(New Hampshire Site Evaluation Committee)

Argued: January 25, 2018
Opinion Issued: May 11, 2018

Donahue, Tucker, & Ciandella, PLLC, of Exeter (Eric A. Maher on the brief and orally), for petitioners Mary Allen & a.

The Law Offices of Kelly E. Dowd, PLLC, of Keene (Kelly E. Dowd on the brief and orally), for petitioner Frederick Ward.

McLane Middleton, Professional Association, of Manchester (Wilbur A. Glahn, III, Barry Needleman, and Rebecca S. Walkley on the brief, and Mr. Glahn orally), for the respondent, Antrim Wind Energy, LLC.

HANTZ MARCONI, J. The petitioners, Mary Allen, Fred Ward, and other interested parties, appeal the decision of the New Hampshire Site Evaluation Committee (Committee) authorizing the respondent, Antrim Wind Energy, LLC (Antrim Wind), to construct and operate nine wind turbines in the town of Antrim. We affirm.

The record supports the following facts. Antrim Wind is a Delaware limited liability company formed as a special purpose entity to develop, build, own, and operate a wind turbine project. Antrim Wind originally filed an application (Antrim I) with the Committee in January 2012, seeking authorization to construct ten wind turbines along Tuttle Ridge and Willard Mountain in Antrim. The wind turbines were to have a height of approximately 492 feet. "Six of the turbines would be equipped with red flashing aviation obstruction lights." The project was also to consist of four miles of new gravel surfaced roads, a joint electrical system, an interconnection substation, and a maintenance building. Antrim Wind further proposed to construct a meteorological tower between turbines three and four to obtain wind data, dedicate 800 acres of land to conservation easements, and install a radar activated lighting system. Competing photo simulations were prepared by Antrim Wind and parties in opposition to the Antrim I application.

After holding adjudicative hearings, a subcommittee of the Committee denied Antrim Wind's application. In its April 2013 decision, the subcommittee found that the Antrim I project was "simply out of scale in [the] context of its setting and adversely impact[ed] the aesthetics of the region in an unreasonable way." It further found that the proffered mitigation plan was "insufficient to mitigate the visual effects" of the project on the regional setting. In response, Antrim Wind moved to reopen the record to present a revised plan with new documents and evidence. The subcommittee denied the motion, finding that Antrim Wind was seeking to "introduce evidence which would materially change the original [a]pplication and would require extensive de novo review as opposed to a full consideration of the issues presented at the hearing." (Quotation and underline omitted.) Antrim Wind did not appeal the subcommittee's denial.

In 2013 and 2014, the legislature amended the statute governing the Committee's review of site and facility applications. See RSA 162-H:10, VII (2014) (amended 2017). RSA 162-H:10, VII required the Committee to adopt substantive rules including "specific criteria to be applied in determining if the requirements of RSA 162-H:16, IV [(2014)] have been met by the applicant for a certificate of site and facility." See Laws 2013, 134:2; Laws 2014, 217:16. The Committee proceeded to promulgate rules in accordance with the foregoing. See generally N.H. Admin. R., Site 301.06-301.18. Among other changes, the rules set substantive limits for operational noise emitted from a wind energy facility, see N.H. Admin. R., Site 301.14(f)(2)(a), and for shadow flicker, see N.H. Admin. R., Site 301.14(f)(2)(b), (f)(3), and require the subcommittee to consider seven distinct categories of impact with regard to aesthetics, see N.H. Admin. R., Site 301.14(a)(1)-(7).

Subsequently, on October 2, 2015, Antrim Wind filed a second application (Antrim II) with the Committee, seeking authorization to construct

nine wind turbines along the "Tuttle Hill ridgeline spanning southwestward to the northeastern slope of Willard Mountain." In this proposal, the height from foundation to blade-tip for eight of the turbines is 488.8 feet and the ninth turbine is 446.2 feet, which is a downward departure from the ten 492-feet turbines proposed in Antrim I. Antrim Wind also proposed to construct a meteorological tower between turbine two and three, a main access road, and two spur roads. A joint collector system, interconnection substation, and operations and maintenance building would also be constructed. The mitigation plan is similar to the plan in Antrim I, but provides an additional one hundred acres of conservation land, a grant of $100,000 to the New England Forestry Foundation, additional public benefits to the town of Antrim, and a shadow control protocol. Also new to the Antrim II application is a visual assessment report, a sound level report, and a shadow flicker analysis, in conformance with New Hampshire Administrative Rules, Site 301.08, .16, .18.

On October 20, 2015, the Committee appointed a seven-member subcommittee to preside over the application, two of whom were members of the public pursuant to RSA 162-H:4-a (Supp. 2017). One of the public members subsequently resigned and the Committee appointed an alternate public member (the alternate).

The subcommittee conducted two site visits and held adjudicative hearings over thirteen days between September and November 2016. After three days of deliberations, it voted 5-1 to grant Antrim Wind's application subject to certain conditions. The subcommittee found that there had been a "substantial change" between the Antrim I and Antrim II applications and that the project as proposed in Antrim II would not have an unreasonable adverse effect on the health, safety, or aesthetics of the region. The petitioners filed motions for rehearing, which the subcommittee denied. This appeal followed.

On appeal, the petitioners argue that the subcommittee's decision was unreasonable, unlawful, and unjust for the following reasons: (1) the subcommittee was unlawfully constituted; (2) the denial of Antrim I barred Antrim Wind's Antrim II application under the doctrine of res judicata as well as the subsequent application doctrine as set forth in Fisher v. City of Dover, 120 N.H. 187 (1980) (hereafter, the Fisher doctrine); and (3) there is insufficient evidence in the record to support the subcommittee's finding that the project proposed in Antrim II will not have an unreasonable adverse impact on aesthetics, public health, and safety.

Decisions by the subcommittee are reviewed in accordance with RSA chapter 541. See RSA 162-H:11 (2014). Under RSA 541:13, we will not set aside the subcommittee's order except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that it is unjust or unreasonable. RSA 541:13 (2014). The subcommittee's findings of fact are presumed prima

facie lawful and reasonable.  Id.  In reviewing those findings, our task is not to determine whether we would have found differently or to reweigh the evidence, but, rather, to determine whether the findings are supported by competent evidence in the record.  See Appeal of Malo, 169 N.H. 661, 668 (2017).  We review the subcommittee's rulings on issues of law de novo.  See id. at 666.

We first address the petitioners' argument that the subcommittee was not lawfully constituted and, thus, the subcommittee's decision approving the Antrim II application was invalid.  Specifically, the petitioners argue that the subcommittee did not have two public members participate in all stages of the adjudication because, following one public member's resignation, the alternate appointed "was not present for any hearing, including the adjudicative and deliberative sessions."  Antrim Wind asserts that the petitioners did not raise this issue until after the order was issued and, therefore, it should be deemed waived.  Antrim Wind further contends that the petitioners' argument is meritless because the subcommittee always consisted of seven members — two of whom were public members.

"Interested parties are entitled to object to any error they perceive in governmental proceedings, but they are not entitled to take later advantage of error they could have discovered or chose to ignore at the very moment when it could have been corrected."  Fox v. Town of Greenland, 151 N.H. 600, 604 (2004) (quotation omitted).  The petitioners argue that they could not have known of the alternate's absence until after deliberations because she could have reviewed the record on her own and then participated in deliberations.  We assume, without deciding, that the petitioners raised this issue at the earliest possible time; however, we agree with Antrim Wind that the subcommittee was nevertheless lawfully constituted.

The subcommittee's creation and composition is governed by RSA 162-H:4-a, I: "The chairperson may establish subcommittees to consider and make decisions on applications, including the issuance of certificates . . . ."  RSA 162-H:4-a, II provides:

> When considering the issuance of a certificate or a petition of jurisdiction, a subcommittee shall have no fewer than 7 members. The 2 public members shall serve on each subcommittee with the remaining 5 or more members selected by the chairperson from among the state agency members of the committee. . . .  Five members of the subcommittee shall constitute a quorum for the purpose of conducting the subcommittee's business.

If a public member is not available for good reason, the chairperson of the Committee "shall appoint the alternate public member."  RSA 162-H:3, X

4

(Supp. 2017).  This process is applicable to both the Committee and subcommittee members.  See RSA 162-H:3, XI (Supp. 2017).

There is no ambiguity in RSA 162-H:4-a.  The plain language simply requires that a subcommittee consist of seven members.  See Franklin v. Town of Newport, 151 N.H. 508, 509 (2004) (when the language of a statute is plain and unambiguous, we do not look beyond it for further indications of legislative intent).  Here, at all times, the subcommittee consisted of such.  Notwithstanding the petitioners' claim that the alternate  did not participate in various stages of the proceedings, there is no evidence that the alternate took any sort of leave — which the Committee does not recognize — or otherwise vacated her position as a subcommittee member during the pendency of the proceedings.

The petitioners do not challenge that a quorum existed, nor could they given that there were always five members of the subcommittee present.  See RSA 162-H:4-a, II.  Though the alternate did not attend the hearings, given the plain language of RSA 162-H:4-a, there is no requirement that she do so.  See Petition of Malisos, 166 N.H. 726, 729 (2014) (when interpreting a statute we will not consider what the legislature might have said or add language that the legislature did not see fit to include).  There is also no requirement that the quorum meet the same composition requirements as a subcommittee.  See Appeal of Keene State College Educ. Ass'n, 120 N.H. 32, 35 (1980) (when statute governing the board's total membership has guidelines as to the particular composition, but the statute governing the quorum does not, "no such balance is required of a quorum").

To the extent that the petitioners assert policy reasons as to why public members should be present for the entire adjudication, such arguments should be addressed to the legislature, rather than to this court.  See, e.g., Petition of Kilton, 156 N.H. 632, 645 (2007).  Because we conclude that the subcommittee was properly constituted — always consisting of seven members — we need not address the petitioners' remaining arguments regarding the composition of the subcommittee.

Next, the petitioners argue that the subcommittee should have denied the Antrim II application because its decision in Antrim I was binding under the doctrines of res judicata and Fisher.  Specifically, they argue that Antrim II did not meaningfully resolve the fundamental issues identified in Antrim I and, thus, the subcommittee was precluded from granting the Antrim II application.  Antrim Wind counters that Antrim II is materially different from Antrim I and the subcommittee's order is otherwise lawful and reasonable.

We construe the petitioners' argument regarding the Fisher doctrine to encompass their res judicata claim; that is, that the Antrim II application did

not "meaningfully resolve" the fundamental issues that the subcommittee identified in Antrim I and, therefore, it is barred from review. Though we have yet to decide whether the Fisher doctrine applies to successive applications submitted to the Site Evaluation Committee, it is not contested by either party, and thus, we assume without deciding that Fisher's reasoning could be extended to this case.

> Applying the Fisher doctrine in this context, an applicant before a [subcommittee] bears the burden of demonstrating that a subsequent application materially differs in nature and degree from its predecessor. The determination of whether changed circumstances exist is a question of fact. This determination must be made, in the first instance, by the [subcommittee]. On appeal, the [subcommittee's] factual findings are deemed prima facie lawful and reasonable. We will uphold the [subcommittee's] decision unless it is not supported by the evidence or is legally erroneous.

CBDA Dev., LLC v. Town of Thornton, 168 N.H. 715, 724 (2016) (quotation and citations omitted).

Here, in determining that the Antrim I application would have an unreasonable adverse effect on the aesthetics of the region, the subcommittee found that: (1) the turbines would appear out of scale and context; (2) the project would have an unreasonable adverse effect on the viewshed from Willard Pond and the dePierrefeu Wildlife sanctuary; and (3) the proposed mitigation measures were insufficient to mitigate the visual effects of the project. Acknowledging these issues in the Antrim II application, Antrim Wind specifically addressed them in its visual assessment. Antrim Wind proposed to remove turbine 10, lower turbine 9, and enter into a mitigation agreement with Antrim town officials regarding Gregg Lake Beach. It further proposed to pay $100,000 for offsite land conservation, include a landscaping plan to provide visual screening to reduce potential impacts associated with the construction of the substation and operation and maintenance building, commit to restore and re-vegetate roads and cut/fill slopes and to break up the roads after decommissioning, and to preserve the entire ridgeline of the project. As Antrim Wind points out, "these changes reduced the size of the [p]roject by more than 10 percent" and the added mitigation measures "would now conserve 908 total acres," which is 100 more acres than that proposed in Antrim I.

The petitioners argue that the foregoing changes in Antrim II nevertheless do not meaningfully resolve the concerns raised by Antrim I. According to the petitioners, the photo simulations do not reveal a significant change between the visual impact in Antrim I and Antrim II. The record reflects that the subcommittee deliberated and "individually analyzed every photo-simulation prepared by each expert" to find that the project would not

6

have an unreasonable adverse impact on the scenic resources. Although the petitioners may disagree with the subcommittee's ultimate assessment that the visual impact between Antrim I and Antrim II differs, they have not demonstrated that the subcommittee's finding is unreasonable.

The petitioners further contend that "[i]t defies reason that these off-site mitigation measures would not be suitable to mitigate aesthetic effects in Antrim I but can now form the basis for the subcommittee's finding that the [Antrim II] application meaningfully resolved the [subcommittee's] stated concerns in Antrim I." The subcommittee stated, in the Antrim I decision, however, that a suggested reduction in the size of the project and the elimination of two turbines "may substantially mitigate the unreasonable adverse effect on aesthetics." Because the Antrim II application was modified and reduced in size, it cannot be said that it was unreasonable for the subcommittee to find that the "additional measures offered by [Antrim Wind] sufficiently mitigate, minimize and avoid impacts of the [p]roject on aesthetics."

The petitioners also argue that the change in law between the Antrim I and Antrim II applications does not materially change the subsequent application. We disagree. As the subcommittee found, the differences in the law between Antrim I and Antrim II are "material changes that alter the situation."

The changes in the regulations provided specific criteria for the subcommittee to consider when assessing whether there is an unreasonable adverse effect on aesthetics in the Antrim II application. See N.H. Admin. R., Site 301.14(a)(1)-(7). The change in regulations also led to the submission of more detailed analysis by Antrim Wind's witnesses. Specifically, the subcommittee found that "[t]he changes in the substantive administrative rules altered the situation for [Antrim Wind] and provided 'fixed targets' in the form of substantive limitations on impacts to be met in any new application." The petitioners contend that the subcommittee that denied Antrim I considered many of the factors now codified in New Hampshire Administrative Rules, Site 301.14(a). However, the petitioners have not demonstrated that the Antrim I subcommittee considered or applied to the Antrim I application each of the factors to the degree now delineated in the regulations.

In addition, the petitioners contend that the subcommittee erred in finding, in its Antrim II decision, that its denial of Antrim Wind's motion to reopen the record in Antrim I invited the filing of a modified application. Evidence of an invitation to submit a modified application to meet an agency's concerns, however, merely acts as additional evidence that a subsequent application so modified is materially different. See Hill-Grant Living Trust v. Kearsarge Lighting Precinct, 159 N.H. 529, 536 (2009) ("[I]t is logical to presume that if [an agency] invites submission of a subsequent application

7

modified to meet its concerns, it would find an application so modified to be materially different from its predecessor, thus satisfying Fisher."). Thus, we need not decide whether the subcommittee invited the re-filing of an application in Antrim I, because it is not required in order for the subcommittee to find that a subsequent application meets the requirements of Fisher. In light of material changes between the Antrim I and Antrim II applications, as discussed above, it was not unreasonable for the subcommittee to find that Antrim Wind's subsequent application resolved the concerns raised in Antrim I and, thus, Antrim II is not barred by the Fisher doctrine.

Lastly, the petitioners argue that there was insufficient evidence for the subcommittee to make a number of its factual findings regarding aesthetics, public health, and safety. The legislature has delegated broad authority to the Committee to consider the "potential significant impacts and benefits" of a project, and to make findings on various objectives before ultimately determining whether to grant an application. See RSA 162-H:16, IV. When faced with competing expert witnesses, "a trier of fact is free to accept or reject an expert's testimony, in whole or in part." Appeal of N.H. Elec. Coop., 170 N.H. 66, 74 (2017) (quotation omitted). When reviewing the subcommittee's decision, it is not our task to determine whether we would have credited one expert over another, or to reweigh the evidence, but rather to determine whether its findings are supported by competent evidence in the record. See Appeal of Malo, 169 N.H. at 668.

The petitioners essentially contest the subcommittee's decision to credit Antrim Wind's experts and reports over their own. Specifically, the petitioners challenge the subcommittee's findings regarding the sound assessment, shadow flicker assessment, visual impact, impact on property values and development, and the economic feasibility of implementing various mitigation measures. After review of the record, we conclude that there is competent evidence to support all of the subcommittee's factual findings. The subcommittee deliberated about each of these assessments and impacts and determined which experts — Antrim Wind's — it found to be more credible. The subcommittee also imposed certain mitigation measures and conditions to address remaining concerns and to ensure regulatory compliance. Accordingly, we conclude that the petitioners have failed to show reversible error.

Affirmed.

LYNN, C.J., and HICKS, J., concurred.